# EXHIBIT A

JAMS NEW YORK Reference No. 1425034540
-----------------------------------------------------------X
In the Matter of the Arbitration Between

FSG Services LLC,

    Claimant and Counterclaim Respondent,

       and                      PARTIAL FINAL AWARD

Flutter Entertainment plc,

    Respondent and Counterclaimant.
-----------------------------------------------------------X

This Partial Final Award addresses certain claims and counterclaims asserted by

Claimant and Counterclaim Respondent FSG Services LLC ("FSG" or "FOX"), and

Counterclaimant Flutter Entertainment plc ("Flutter"), arising from a Legal Binding Term Sheet

("LBTS") signed on October 1, 2019, a copy of which is annexed to this Partial Final Award as

Exhibit 1, and incorporated by reference into this Partial Final Award as if fully set forth herein.

FOX and Flutter entered into the LBTS in connection with a proposed merger between

Flutter's online sports gaming company FanDuel Group Parent LLC ("FDG" or "FanDuel

Group") and The Stars Group ("TSG"), for which Flutter needed a waiver of contractual

exclusivity rights from Fox Corporation, the ultimate owner of FSG.  On terms set forth in the

LBTS that are discussed in detail *in fra*, in exchange for the waiver of exclusivity, Flutter gave

FOX an option to buy 18.6% of FanDuel and Flutter was required to provide certain resources to

TSG's FOX-branded start up FOX Bet, a FanDuel competitor.[1]

---

[1] Following the execution of the LBTS, on Flutter presented to FOX a proposed IPO transaction
to which FOX objected, and which Flutter chose not to pursue following proceedings before an
Emergency Arbitrator.  The proposed IPO became the subject of claims asserted by FOX in this
Arbitration that are addressed in a Stipulation and Order signed by the Arbitrator on October 26,

Parties and Counsel

Claimant and Counterclaim Respondent is represented by: Gregory P. Joseph, Esq., Mara Leventhal, Esq., and Christopher J. Stanley, Esq., Joseph Hage Aaronson LLC, 485 Lexington Avenue, 30th Floor, New York, NY 10017; Brian J. Fisher, Esq., and Michael W. Ross, Esq., Jenner & Block LLP, 1155 Sixth Avenue, New York, NY10036; Ian Heath Gershengorn, Esq., Jenner & Block LLP, 1099 New York Avenue NW, Washington, DC 20001; Terri L. Mascherin, Esq., Jenner & Block, 353 N. Clark Street, Chicago, IL 60654; Brandon D. Fox, Esq., Jenner & Block LLP, 515 Flower Street, Los Angeles, CA 90071.

Respondent and Counterclaimant is represented by Vineet Bhatia, Esq., and Megan Elise Griffith, Susman Godfrey LLP, 1000 Louisiana Street, Suite 5100, Houston, TX 77002; Stephen Morrissey, Esq., Floyd G. Short, and Emily Parsons, Susman Godfrey LLP, 1201 Third Avenue, Suite 3800 Seattle WA 98101-3000; Amanda Bonn, Esq., Susman Godfrey LLP, 1900 Avenue of the Stars, Suite 1400, Los Angeles, CA 90067; Mark Musico, Esq., and Jennifer Dayrit, Esq., Susman Godfrey LLP, 1301 Sixth Avenue, 32nd Floor, New York, NY 10019.

Agreement to Arbitrate and Applicable Law

The agreement to arbitrate is contained in the LBTS, which states that any dispute arising from this agreement shall be settled by binding arbitration administered by JAMS in accordance with its Comprehensive Arbitration Rules & Procedures (the JAMS Rules) in effect at the time the arbitration is filed," and provides that "all disputes, claims, actions suits or other proceedings arising hereunder shall be governed by, and construed and enforced in accordance with the laws

---

2022 (annexed as Exhibit 2 to this Partial Final Award).  See "Pleadings" and "Post-Hearing Proceedings," *infra.*

2

of the State of New York applicable to contracts wholly made and to be performed within the

State of New York." LBTS Paragraph 9.

Pleadings

The parties have submitted the following pleadings:

FOX Statement of Claim (dated March 29, 2021); Flutter Response, Affirmative Defenses and Counterclaim (filed on April 26, 2021).

FOX Statement of Claim Supplement (filed on May 28, 2021); Flutter Response and Affirmative Defenses (filed on June 25, 2021).

FOX Second Statement of Claim Supplement (filed on July 6, 2021); Flutter Response and Affirmative Defenses (filed on September 17, 2021).

FOX Third Statement of Claim Supplement (filed on August 25, 2021); Flutter Response and Affirmative Defenses (filed on September 18, 2021).

FOX Amendment to the Statement of Claim Supplements (filed on March 16, 2022). Flutter did not file a response to this pleading, as to which it relies on the "deemed denial" provision in JAMS Comprehensive Arbitration Rule 9(e). Flutter email to the Arbitrator dated October 27, 2022.[2]

Arbitration Hearing

The parties submitted pre-hearing briefs on June 13, 2022. An evidentiary hearing was

held on June 21-24, June 27-30, July 6-8, and July 11-12, 2022. The parties submitted

supplemental written testimony on August 9 and August 19, 2022. The parties have also

submitted hundreds of exhibits. See Claimant's Nineteenth Amended Exhibit List, dated

---

[2] On September 28, 2022, Flutter submitted a letter request for leave to file a supplemental counterclaim pertaining to FOX's IPO Claims. FOX has not responded to this request. At oral argument on September 29, 2022, the parties agreed to confer on a schedule to address any new IPO-related issues, and subsequently submitted the Stipulation and Order signed by the Arbitrator on October 26, 2022, which deemed incorporated into this Partial Final Award and annexed as Exhibit 2. This Stipulation and Order effectively supersedes Flutter's September 28, 2022, letter request.

September 28, 2022; Respondent's Twenty-Seventh Amended Exhibit List, dated September 14, 2022.

Post-Hearing Proceedings

The parties submitted post-hearing briefs on August 30, 2022, and submitted post-hearing reply briefs on September 14, 2022. Oral argument was presented on September 29, 2022.

The parties thereafter submitted two proposed Stipulations and Orders, which were signed by the Arbitrator on October 26, 2022: (1) an "IPO Stipulation and Order," which is deemed incorporated into this Partial Final Award and annexed as Exhibit 2; and (2), a "Continuing Jurisdiction Stipulation and Order," annexed to this Partial Final Award as Exhibit 3.

Agreement Regarding Claims to be Adjudicated in this Partial Final Award

The parties have agreed that this Partial Final Award shall address the following claims and counterclaims (including all responses and affirmative defenses submitted by Flutter) pertaining to the issues that were tried at the arbitration hearing, other than the IPO-related claims (addressed in the IPO Stipulation and Order annexed as Exhibit 2 to this Partial Final Award).

- Claims I and II in FOX's March 29, 2021 Statement of Claim (Declaratory Judgment and Specific Performance), pertaining generally to FOX's entitlement to exercise an option to purchase18.6% of FDG (FDG Option) and the exercise price;
- Flutter's Counterclaim in its April 26, 2021 Response, Counterclaim, and Affirmative Defenses, responding to FOX's Statement of Claim, including denial of FOX's right to defer exercise of the FDG option for 10 years;
- Claim VI in FOX's July 6, 2021 Second Statement of Claim Supplement (Declaratory Judgment), pertaining generally to FOX's right to defer exercise of the FDG option for 10 years;
- Claims VII (Specific Performance) and VIII (Breach of LBTS) in FOX's August 25, 2021 Third Statement of Claim Supplement, pertaining generally to FOX's comparable resources claims; and
- Claim IX in FOX's March 16, 2022 Amendment to Statement of Claim Supplement (Declaratory Judgment), also pertaining to FOX's comparable resources claims.

4

See FOX email to the Arbitrator dated October 22, 2022; Flutter email to the Arbitrator dated October 27, 2022.

In addition, in connection with Flutter's Counterclaim and FOX's Claim VI (Second Statement of Claim Supplement), Flutter requests that if the Arbitrator determines that FSG/Fox is entitled to a deferral period for the exercise of the FDG Option, the Arbitrator's award will specify the date from which any such option deferral period will run (as addressed by the parties in their post-hearing briefing and closing arguments). Flutter email to the Arbitrator dated October 27, 2022.

## BACKGROUND

Flutter is a global sports betting, gaming, and entertainment provider and the holding company for a range of international brands and operations. Flutter's U.S. strategy initially centered on the acquisition of a majority ownership interest in FanDuel, one of the two leading fantasy sports operators in the United States. Through a series of transactions completed in mid-to-late 2018, Flutter acquired a 57.8% interest in FanDuel. The remaining minority interests in FanDuel Group included a 37.2% interest held by Fastball LLC ("Fastball"), an investor group formed by KKR, Shamrock Capital, and Comcast Ventures; and a 5% interest held by Boyd Interactive Gaming, L.L.C. ("Boyd"), an American gaming and hospitality company. These ownership interests and the terms of these transactions were finalized in the FanDuel Group Parent LLC Limited Liability Company Agreement ("FDG LLC Agreement") and the Investor Members Agreement of FanDuel Group Parent LLC ("FDG Investment Agreement"), executed on July 10, 2019. As part of these transactions, in addition to the 57.8% ownership stake, Flutter obtained options to acquire Fastball's 37.2% minority stake through two put/call options, one

exercisable in July 2021 and the other exercisable in July 2023, at a price to be determined pursuant to § 9.02(b) of the Investor Agreement and § 8.02 of the LLC Agreement.

In the Summer and Autumn of 2019, Flutter identified and pursued an opportunity to merge with The Stars Group ("TSG"), an international online gaming company headquartered in Canada. The potential merger with TSG provided an opportunity to accelerate Flutter's growth strategy on several fronts throughout much of the world. TSG owned and operated the world's largest online poker operator, PokerStar, and had adapted the PokerStars tech platform for online sports betting in European markets.

Flutter learned that in May 2019, TSG US (a subsidiary of TSG) had entered into a series of agreements with FOX (the "FOX Bet Agreements") by which TSG licensed the FOX Bet brand and committed to launching the FOX Bet online sportsbook (by rebranding TSG's existing BetStars sportsbook) and a free-to-play product that provides cash prizes for predicting the outcomes of sports contests (later branded FOX Bet Super 6), retaining operational control. Under the FOX Bet Agreements, including Clause 5.1 of the Forward Subscription and Contribution Agreement dated May 8, 2019, TSG agreed to an exclusivity provision under which TSG US and its affiliates would not operate another sportsbook in the United States. In addition to the exclusivity provision of the agreement between TSG and FOX, a potential obstacle to a Flutter-TSG merger was presented by the terms of Flutter's agreements with Fastball and Boyd, its minority partners in FDG, under which Flutter was required to conduct its U.S. sports-betting operations exclusively through FanDuel and its subsidiaries.

6

Ultimately, the Flutter-TSG Merger took place on [date], with waivers of exclusivity by Fastball/Boyd and by FOX, pursuant to the terms of the LBTS signed on October 1, 2019, that is the subject of this arbitration.

## FINDINGS AND CONCLUSIONS RE CLAIMS TO BE ADJUDICATED

### FDG Option

On December 3, 2020, Flutter purchased 37.2% of the FDG Units from Fastball for $4.175 billion (the "Accelerated Buyout").

Flutter initially insisted—publicly to its investors and privately to FOX—that the Accelerated Buyout *cancelled* FOX's FDG Option. However, Flutter subsequently offered FSG/FOX the opportunity to purchase 18.6% of the FDG Unit s at their Fair Market Value on July 10, 2021 (as Fair Market Value is defined in Section 8.03of the Limited Liability Company Agreement). Similarly, in this Arbitration, Flutter contends that FOX is entitled to exercise the FDG Option at the Fair Market Value of 18.6% of the FDG Units as of July 10, 2021, as Fair Market Value is defined in Section 8.03 of the Limited Liability Company Agreement (not based on the discounted price that Flutter actually paid or the market value of the FDG Units covered by the LBTS on the date of the Accelerated Buyout). Flutter also contends that FOX has failed to satisfy the conditions set forth in the LBTS to invoke the option of deferring its exercise of the FDG Option for up to ten years (with a 5% annual escalator).

FOX asserts and contends in this Arbitration that as a result of the Accelerated Buyout, the Exercise Price for the FDG Option (18.6% of the Fastball Units) is half of the $4.175 billion paid by Flutter—or $2.0875 billion, subject to the provisions of Paragraph 2 of the LBTS

pertaining to exercise of the FDG Option (including the potential ten-year deferral and 5% annual escalator).

It is undisputed that the parties at no time contemplated or discussed, and that the LBTS does not address the possibility or consequences of Flutter's purchase of the first tranche of Fastball Units outside the 2021 Fastball Put/Call.

It is however indisputable that all parties understood that the FDG Option was a material incentive for FSG/FOX to give up its exclusivity rights with respect to TSG, and that FOX would not have agreed to the terms of the LBTS if it had understood that the FDG Option could be "cancelled" by Flutter's purchase of the Fastball Units outside the 2021 Fastball Put/Call. The essence of the parties' agreement was that the first tranche of the Fastball Units was effectively "earmarked" for FOX, pursuant to the terms of the LBTS.  As a result, as a matter of good faith and fair dealing, the Accelerated Buyout must be construed as effectively advancing the date of the expected purchase, while at the same time maintaining all other LBTS terms relating to the FDG Option--including the determination of Exercise Price according to Fair Market Value as defined in the Investor Agreement, as well as the LBTS provisions relating to the potential ten-year deferral and 5% annual escalator.

<u>Exercise Price</u>

At the time of the Accelerated Buyout, all parties understood that the purchase price of $4.175 billion reflected a substantial discount (estimated separately by Flutter and FOX-and others familiar with the market--at around 40%) from the market value of FanDuel as an entity that could be feely traded (calculated based upon the valuation of FanDuel's publicly-traded competitor, Draft Kings).

The evidence established that Flutter was able to negotiate a substantial discount by purchasing the first tranche prior to July 10, 2021, thereby eliminating potential downside market risk for Fastball, and because due to the application of the "price cap" (Section 9.04 of the Investor Members Agreement) it was likely that only a portion of the first tranche would be subject to the Put/Call process requiring Flutter to pay Fair Market Value (leaving the remaining FDG Units illiquid/unmarketable). Moreover, due to the application of the "price cap," the second tranche would almost certainly not be subject to the 2023 Put/Call, leaving Fastball with additional illiquid/unmarketable Units, thus providing an incentive for Fastball to sell the Units in the second tranche to Flutter at an even greater discount.

It is undisputed that FOX bargained for and expected to pay an Exercise Price reflecting and determined by the operation of the Put/Call mechanism and the definition of Fair Market Value set forth in Section 8.03 of the Limited Liability Company Agreement to be used in setting the Exercise Price in the event the parties are unable to agree—which all parties reasonably assumed would closely approximate the undiscounted Fair Market Value on the date of purchase. Accordingly, FOX has no entitlement under the LBTS to benefit from any price differential for the first tranche resulting from Flutter's purchase outside the Put/Call process, particularly in the absence of an agreement to share any costs or risks associated with an Accelerated Buyout. Moreover, because the purchase price included the more heavily discounted second tranche, the price paid for the first tranche was indisputably substantially greater than one-half of $4.175 billion.

Based upon the above finding, the Arbitrator issued a preliminary ruling on July 12 that the Exercise Price should be the Fair Market Value (as defined in Section 8.03 of the Limited Liability Company Investment Agreement) of 18.6% of FanDuel on December 3, 2020.

9

Although the record as of July 12 contained evidence from several fact witnesses from which this value could be determined, and the Arbitrator had asked both parties' experts to discuss the valuation of FanDuel on December 3, 2020, the expert reports and testimony had focused primarily on the value of FanDuel on July 10, 2021, and any comments on valuation as of December 3, 2020, were carefully qualified due to not having performed a rigorous, methodologically appropriate analysis. The parties therefore agreed to provide supplemental written testimony with respect to the Fair Market Value of FanDuel on December 3, 2020.

The Arbitrator subsequently received supplemental testimony from expert witnesses Edward King and Jonathan I. Arnold (FOX) and Professor Glenn Hubbard (Flutter), as well as supplemental testimony from Flutter CFO Jonathan Hill that included analyses from third party financial advisors (over the objection of FOX, based, *inter alia*, on Mr. Hill's opportunity, but failure to offer this evidence during his testimony as a fact witness).

At the time of the Accelerated Buyout, both parties independently estimated internally and stated publicly that Flutter obtained 37.2% of FanDuel at a "discount" of approximately 40%, implying a full (undiscounted) FanDuel value of $18.705 billion.

The record also contains a number of contemporaneous valuations of FanDuel prepared by Flutter, Fastball and FOX and/or their financial advisors between November 2020 and January 2021. In addition, the parties' experts have conducted independent valuations of FanDuel on December 3, 2020, for this litigation, using a variety of methodologies.

Flutter's experts observe that "contemporaneous indications of the value of Fan Duel on the December Buyout Date are provided by the values that the parties to this proceeding and the December Buyout assigned to FanDuel in the days leading up to the transaction." Hubbard Supplemental Report, Paragraph 28. Professor Hubbard selects a set of five such valuations,

10

concluding that the "median value in this set * * * is $21.4 billion." Professor Hubbard further notes that "[e]xcluding the November 1, 2020, Flutter valuation of $19 billion, which was outdated as of the December buyout Date, the median is $22 billion." Paragraph 29. The credibility and reliability of Professor Hubbard's analysis is seriously undermined by a number of mis-readings and omissions in his review of the contemporaneous valuations (pointed out in the Supplemental Rebuttal Report of FOX Expert Edward King). For example, Professor Hubbard includes in his "set" a November 30, 2020, FOX document that Professor Hubbard incorrectly reads to contain a FOX's valuation of FanDuel of $22.5 billion (see King Supplemental Rebuttal Report, Paragraph 43), and fails to note that Flutter reiterated its $19 billion valuation (which Professor Hubbard asserts is "outdated"), in a memorandum to its Board in late November 2020, just days before Flutter's Board approved the transaction. Professor Hubbard also includes in his "set" a $22 billion valuation by Flutter "as of the December Buyout Date," which was actually calculated by Flutter's CFO Hill following his testimony in this Arbitration, based on recently "updated" analyses by Goldman Sachs and Davy. At the same time, the valuations proposed by FOX experts King and Arnold are significantly below the $18.705 billion value implied by the estimated 40% discount for the Accelerated Buyout as calculated contemporaneously and independently by FOX and Flutter.

Based upon all of the evidence, I find that the appropriate fair market value of FanDuel on December 3, 2020, is $20 billion and that the Exercise Price for 18.6% of the FDG Units under the LBTS is $3.72 billion.

## FOX Compliance with the LBTS Conditions for a Ten-Year Deferral Period

During the negotiation of the LBTS negotiation, FOX repeatedly expressed its concern that exercise of the FDG Option would require not only FOX, but also its direct and indirect owners, including the Murdoch Family Trust, one of FOX's shareholders, and its beneficiaries (including numerous members of the Murdoch Family), to obtain licensing in each of the 15 states where FanDuel operates. Flutter has acknowledged in its pleadings that there were "substantial challenges presented with respect to licensing that FOX likely does not want to tackle" because "state regulators would very likely require Rupert Murdoch and other members of the Murdoch family to be licensed" and "would likely require extensive and intrusive disclosures of extremely sensitive personal financial information concerning the Murdoch family and their trust."[3]

To address FOX's licensing concerns, Paragraph 2 of the LBTS provides:

> Conditional upon completion of the Combination, Flutter hereby grants FOX a call option (*FDG Option*) to either (i) acquire from Flutter/TSE for cash the investor units in FDG that are the subject of the Fastball Put/Call for the same price payable to Fastball pursuant to the Investor Agreement (*Exercise Price*), along with the rights granted to Fastball and its affiliates related to or associated with such units (which for the avoidance of doubt shall not include any put/call rights in July 2023) and such other rights as may be negotiated pursuant to paragraph 6 below (*Investor Units*); or (ii) (e.g.: if it does not wish to become licensed at that time) pay to Flutter immediately on closing of the Fastball Put/Call the Exercise Price in cash, in return for the grant of a further nil-price call option to acquire the Investor Units from Flutter/TSE at a time of FOX's choosing (e.g.: when it becomes licensed) and, pending the exercise of such nil-price option, the receipt by Fox of all of the economic rights of ownership of the Investor Units (*Nil-Price Option*). FOX may exercise the FDG Option at any time prior to the closing of the Fastball Put/Call (*Put/Call Closing*), provided that the closing of FOX's purchase of the Investor Units shall not take place before such closing. If FOX reasonably determines, following consultation with legal counsel, that its exercise of the FDG Option would require licensing that FOX is unwilling or unable by the time of the Put/Call Closing to obtain, then the FDG Option shall remain exercisable for ten (10) years after the Put/Call Closing;

---

[3]Flutter Response to FOX Statement of Claim, Paragraph 111.

> provided that, after the Put/Call Closing, the FDG Option would only be exercisable to acquire the Investor Units (not the Nil-Price Option), and the purchase price would be the Exercise Price, subject to a five percent (5%) annual escalator, if the FDG Option is not exercised within 12 months after the Put/Call Closing.

Flutter clearly understood that FOX would not pursue (i) (the "Acquisition Option") and agreed to give FOX the widest possible discretion in determining whether the Nil Price Option would require licensing, with little, if any, expectation that FOX would choose this option. Indeed, the record reflects that Flutter itself believed that the Nil-Price Option would likely trigger licensing requirements unacceptable to FOX, and that FOX was therefore virtually certain to seek to defer exercise of the FDG Option. Knowing that FOX would reject any requirement that the determination of licensing requirements under the Nil-Price Option be made by a third-party, Fox made the strategic decision to focus its negotiating efforts on minimizing the deferral term and on obtaining a favorable annual percentage of the "escalator," which Flutter calculated it would need to cover the "carrying cost" of the FDG Option, and to include exploration of "alternative transaction structures under which it could provide financial support for Flutter's acquisition of the units from Fastball while avoiding any need [for] licensing" among the topics for further good faith negotiation in Paragraph 5 of the LBTS.[4]

---

[4] Paragraph 5 provides: "The Parties acknowledge and agree that they shall in good faith negotiate, together with other relevant stakeholders, in respect of: (a) the future ownership and conduct of Flutter's US businesses, and additional rights to be granted to FOX in respect of FDG following exercise of the FDG Option, in each case so as to provide optimum alignment between the two brands in the US, maximize the financial performance of each of TSG and FDG and establish the most efficient operating platform for the US businesses following completion of the Combination, (b) the structure of, and if necessary alternatives to, the Nil-Price Option, to permit FOX to realize the benefits of the FDG Option if it is unwilling or unable to obtain all requisite licenses or other regulatory approvals prior to the closing of the Fastball Put/Call and (c) alternatives to provide, if so requested by Flutter/TSE, liquidity to Flutter/TSE, in the event that FOX is unwilling or unable to exercise the FDG Option prior to the closing of the Fastball Put/Call. This period of negotiation shall commence with the publication of the announcement of the Combination and end with the publication of the shareholder documentation in connection

The undisputed evidence presented at the Arbitration hearing regarding the steps taken by FOX to determine whether the Nil-Price Option would require licensing is set forth in detail in FOX's pre-hearing brief. There is no dispute that, as of July 5, 2021, FOX decided, and notified Flutter, that it was "unwilling or unable to obtain" the requisite licensing.

Notwithstanding this evidence, Flutter contends that FOX is not entitled to the Ten-Year Option (1) because FOX did not *reasonably* determine that the exercise of the FDG Option through the Nil-Price Option would require licensing (based largely on FOX's failure to petition for a waiver of required licensing); (2) because FOX engaged in "a bad faith post-litigation effort to trigger the Ten-Year Option;" and (3) because FOX has failed to fulfill a "precondition" of the 10-Year Option, to "which Flutter asserts is required by Paragraphs 5(b) and 5(c) of the LBTS.

For substantially the reasons set forth in detail in FOX's pre- and post-hearing briefing, the Arbitrator finds Flutter's position regarding the requirements for invoking the Ten-Year Deferral to be contrary to the express terms of the LBTS, contrary to the intent of the parties as reflected in the extensive evidence regarding the negotiation of these provisions, and inconsistent with what FOX and Flutter told their boards, critical investors, and the public  FOX's determination that its exercise of the FDG Option would require licensing was thus made (1) "following consultation with legal counsel," (2) who conveyed to FOX the PGCB's position that the Nil-Price Option would require licensing, and (3) who had previously conveyed to FOX the PGCB's position that the Murdoch Family Trust would be subject to Pennsylvania's licensing requirements in

---

with the shareholder meetings at which approval of the Combination will be sought from Flutter's and Stars' shareholders or the date that is six (6) months following publication of the announcement of the Combination, whichever is later."

14

connection with the FOX Bet Option and that any petition for waivers relating to the trust would be a matter of first impression before the PGCB. Notably, Flutter's experts failed to establish that the Nil-Price Option would not require licensing and conceded that some licenses would be required if FOX were to take the Nil-Price Option. This confirms that FOX's licensing determination was reasonable. Finally, Flutter neither offered during the evidentiary hearing, nor cites in its post-hearing briefs any evidence that Flutter requested that FOX comply with 5(b) and 5(c) during the 6-month window, or at any other time, or even asserted that FOX was required to do so until this after thought appeared in Mr. Hill's supplemental submission (not subject to cross-examination).

Based upon all of the evidence, the Arbitrator finds that FOX has fully satisfied the contractual requirements of the LBTS to invoke the Ten-Year Option, and that FOX's licensing determination was reasonable and satisfied the implied covenant of good faith and fair dealing. Flutter's belated request that FOX be directed to negotiate alternative funding structures is denied.

Commencement of Ten-Year Deferral Period

Consistent with the expectations reflected in the LBTS, and the above findings regarding the advanced date of the purchase contemplated by the LBTS, I find that the ten-year deferral period for exercise of the FDG Option by FOX commenced on December 3, 2020.

### Flutter's Obligation to Provide Resources to TSG

FOX seeks a declaratory judgment that Flutter has not honored its obligation in §3(g) of the LBTS to "provide TSG with commercially reasonable resources to pursue the growth, development and profitability of the FOX Bet branded products and services, which resources, in the aggregate, shall be comparable to those provided to FDG."

This claim is meritless and requires only summary discussion.

It is undisputed that Paragraph 3(g) was designed to address FOX's concern that Flutter would favor FanDuel because Fox-Bet was a potential competitor.

In its Motion for Partial Summary Judgment, and at the Arbitration Hearing, FOX asserted that Paragraph 3(g) requires Flutter to provide Fox Bet with "equal" resources, *i.e.*, requires Flutter to allocate the same budget to the start-up Fox Bet that Flutter provides to FanDuel.

As discussed in the Arbitrator's preliminary rulings on July 12, the evidence pertaining to the negotiation of this provision of the LBTS demonstrated unequivocally that that Flutter insisted that it would commit to providing only "commercially reasonable" resources, that, in contrast to other provisions of Paragraph 3, FOX never proposed the term "equal" in connection with resources(which it knew would be rejected by Flutter), and that Flutter understood the term "comparable" to require Flutter to provide commercially reasonable resources that would have been provided by an independent owner or investor (such as FOX was to TSG ) without divided loyalties or incentives to favor another business unit.

Moreover, the evidence presented at the Arbitration Hearing established overwhelmingly that notwithstanding Flutter's discovery of staggering, previously unknown problems with

16

TSG's betting platform (which FOX refused to acknowledge), Flutter has in fact invested disproportionate resources well beyond any measure of commercial reasonableness.

I therefore find no breach of Flutter's obligations under Paragraph 3(g) and deny FOX's request for a declaratory judgment.

## CONTINUING JURISDICTION

Pursuant to the IPO Stipulation and Order and the Continuing Jurisdiction Stipulation and Order annexed to this Partial Final Award as Exhibits 2 and 3, and incorporated by reference as if fully set forth herein, the Arbitrator retains jurisdiction to hear and adjudicate any and all issues arising under the LBTS, other than those issues as to which the Arbitrator has issued a Partial Final Award in Section II, *supra*, including, but not limited to issues pertaining to any IPO with respect to the FDG Units previously proposed by Flutter or that may be proposed in the future by Flutter prior to the close of the Deferral Period, as defined *supra*, page 15.

SO ORDERED.

Kathleen A. Roberts
Arbitrator

November 4, 2022

I, Kathleen A. Roberts, do hereby affirm that I am the Arbitrator described in, and who executed, this instrument which is my Partial Final Award.

Kathleen A. Roberts

17

JAMS NEW YORK Reference No. 1425034540

------------------------------------------------------------X

In the Matter of the Arbitration Between

FSG Services LLC,

    Claimant and Counterclaim Respondent,

       and                         PARTIAL FINAL AWARD
                                      November 4, 2022

Flutter Entertainment plc,

    Respondent and Counterclaimant.

------------------------------------------------------------X

EXHIBIT 1

**Strictly Private and Confidential**

**Flutter/Fox**
**Legally binding term sheet**

*This document sets out the terms on which Flutter Entertainment plc (**Flutter**) and FSG Services LLC (**FOX**) agree to certain matters relating to the ongoing ownership in, and conduct of, the US businesses of Flutter and The Stars Group Inc. (**Stars**) in light of the proposed acquisition or merger of Stars by or with Flutter (the **Combination**).*

| | |
|---|---|
| **1. Parties** | FOX |
| | TSG Interactive US Services Limited (**TSG**) |
| | Flutter (each a **Party** and together the **Parties**) |
| **2. FOX option re: stake in FDG** | Pursuant to an agreement dated 10 July 2019 (**Investor Agreement**), TSE Holdings Limited (a wholly owned subsidiary of Flutter) (**TSE**) has a put and call option with Fastball Holdings LLC (**Fastball**) for a 30-day period starting on 10 July 2021 to acquire approximately 18.5% of the investor units in FanDuel Group Parent LLC (**FDG**) (amounting to 50% of Fastball's holding of investor units in FDG) at fair market value (**Fastball Put/Call**). In the event that Fastball does not exercise such put option, Flutter will (or will cause TSE to) exercise the call option. Conditional upon completion of the Combination, Flutter hereby grants FOX a call option (**FDG Option**) to either (i) acquire from Flutter/TSE for cash the investor units in FDG that are the subject of the Fastball Put/Call for the same price payable to Fastball pursuant to the Investor Agreement (**Exercise Price**), along with the rights granted to Fastball and its affiliates related to or associated with such units (which for the avoidance of doubt shall not include any put/call rights in July 2023) and such other rights as may be negotiated pursuant to paragraph 6 below (**Investor Units**); or (ii) (e.g.: if it does not wish to become licensed at that time) pay to Flutter immediately on closing of the Fastball Put/Call the Exercise Price in cash, in return for the grant of a further nil-price call option to acquire the Investor Units from Flutter/TSE at a time of FOX's choosing (e.g.: when it becomes licensed) and, pending the exercise of such nil-price option, the receipt by Fox of all of the economic rights of ownership of the Investor Units (**Nil-Price Option**). FOX may exercise the FDG Option at any time prior to the closing of the Fastball Put/Call (**Put/Call Closing**), provided that the closing of FOX's purchase of the Investor Units shall not take place before such closing. If FOX reasonably determines, following consultation with legal counsel, that its exercise of the FDG Option would require licensing that FOX is unwilling or unable by the time of the Put/Call Closing to obtain, then the FDG Option shall remain exercisable for ten (10) years after the Put/Call Closing; provided that, after the Put/Call Closing, the FDG Option would only be exercisable to acquire the Investor Units (not the Nil-Price Option), and the purchase price would be the Exercise Price, subject to a five percent (5%) annual escalator, if the FDG Option is not exercised within 12 months after the Put/Call Closing. The Investor Agreement and the limited liability company agreement of FDG, both as disclosed to FOX, contain all of the terms, conditions and rights relating to the Fastball Put/Call and/or the Investor Units; and, so long as the FDG Option remains outstanding, |

none of the terms, conditions or rights of or in respect of the Fastball Put/Call, nor of or in respect of the Investor Units, shall be waived or amended without FOX's prior written consent. For clarity, amendments to Fastball's rights in respect of investor units that are not subject to the 2021 Fastball Put/Call, and any agreements or arrangements with Fastball that do not affect the 2021 Fastball Put/Call or the Exercise Price, shall not require FOX's prior written consent.

**3. Exclusivity**     The exclusivity and non-competition rights in clause 5.1 of the Forward Subscription and Contribution Agreement of 8 May 2019 will not apply to the business carried on by FDG and its subsidiaries, provided that FDG and its subsidiaries do not, without the prior written consent of FOX, which may be granted or withheld in FOX's sole discretion, undertake any material M&A or fundamental business change, it being understood and agreed that (a) except as set forth herein to the contrary, in the ordinary course of FDG's business, FDG and its subsidiaries shall be free to pursue organic development as a natural extension of the FanDuel Sportsbook and its related products and services as well as ordinary course M&A, in each case consistent with FDG's business plans approved or adopted by Flutter; (b) all business activity, including M&A, by Flutter and its affiliates in the Category (as defined in the FOX Bet Agreements, defined below) in the U.S. shall be conducted only by FDG, TSG or their respective subsidiaries; (c) any acquisition of any Person, business or line of business (in each case whether by merger, amalgamation, stock purchase, asset purchase, reorganization, consolidation, share exchange, business combination, sale-leaseback transaction or otherwise) which requires FDG to spend more than $75m, any minority investment of $50 million or more in any third party person, business or line of business or any acquisition of assets from a third party for consideration of $75 million or more, in each case whether payable in cash or in kind, shall be deemed to be material M&A and therefore subject to FOX's approval right in this paragraph 3; (d) the development, launch, acquisition of or investment in a digital sports betting (other than horse-racing betting) business or digital sports betting (other than horse-racing betting) product line that does not use "FanDuel" as its primary brand shall be deemed to be material M&A or a fundamental business change, as the case may be, and therefore subject to FOX's approval right in this paragraph 3, except that (i) in any State in which FDG is prohibited from using the FanDuel brand under law or regulation or any existing or future market access arrangement (which arrangement contains a bona fide requirement that FDG use the third party brand of such market access arrangement partner), FDG may develop, launch, acquire or invest in a new brand for its digital sports betting products solely for use in such State and shall not be required to get Fox's consent for such development, launch, acquisition or investment (unless consent is required pursuant to subpart (c) above) but shall inform Fox in advance prior to developing, launching, acquiring or investing in any such new brand; and (ii) if required by the terms of an existing third party market access agreement, or if so required by a market access counterparty in order to secure a future third party market access agreement with such

CONFIDENTIAL

counterparty, FDG shall be free to provide a white-label platform to the market access counterparty pursuant to such agreement); (e) in relation to any new market access arrangements initiated after completion of the Combination, Flutter shall use all reasonable efforts to secure comparable market access for the FanDuel and Fox Bet brands by entering into new agreements or arrangements which, in the aggregate, benefit both brands on an equivalent basis, including without limitation by enabling TSG to provide a white-label platform to a market access counterparty if so required by the market access counterparty in order for TSG to secure a third party market access agreement with such counterparty; (f) none of Flutter nor any of its affiliates shall cause or agree to any amendment, termination or exploitation of any market access agreement or arrangement to which TSG or a subsidiary thereof (or any entity that is an affiliate of TSG prior to the Combination) is a party in a manner that adversely affects TSG and its subsidiaries' ability to exploit such agreement or arrangement for the benefit of the FOX Bet brand; (g) so long as FOX holds or has the right to acquire interests in TSG, Flutter shall provide TSG with commercially reasonable resources to pursue the growth, development and profitability of the FOX Bet branded products and services, which resources, in the aggregate, shall be comparable to those provided to FDG and, in any event, shall be sufficient to satisfy Stars' and TSG's commitments under the FOX Bet Agreements; and (h) Flutter will give Fox and TSG advance notice as to any material business plan of or involving FDG and its subsidiaries that could reasonably be expected to adversely affect the resources provided to TSG for the growth, development and profitability of the FOX Bet branded products and services.

Flutter hereby certifies that any and all obligations or restrictions on Flutter or any of its affiliates pursuant to any agreement, commitment or arrangement, including the obligations and restrictions set forth in Article III of the Investor Members Agreement of FDG dated 10 July 2019, to the extent that such obligations and restrictions could interfere with or affect Flutter's or its affiliates' compliance with the obligations and restrictions in this document have been irrevocably waived by each counterparty that holds any such rights to so obligate or restrict Flutter.

FOX's agreement with respect to the applicability of the exclusivity and non-competition rights in clause 5.1 of the Forward Subscription and Contribution Agreement, as set forth in this paragraph 3, is contingent upon the foregoing certification by Flutter being true and complete in all respects and Flutter's and its affiliates' compliance with the obligations and restrictions in this document.

TSG hereby waives FOX's compliance with the exclusivity and non-competition provisions set forth in the FOX Bet Agreements in respect of any and all transactions, arrangements or agreements between FOX and its affiliates, on the one hand, and FDG and its affiliates, on the other hand, in respect of the FanDuel Sportsbook and related products and services following completion of the Combination.

4. **FOX's rights in**   Nothing in this document shall alter or amend FOX's existing

CONFIDENTIAL                                                          FLUTTER_00086181

**respect of FOX Bet**     arrangements with respect to FOX Bet pursuant to the agreements between, amongst others, FOX and TSG dated 8 May 2019 (*FOX Bet Agreements*), other than the waivers set forth in paragraph 3 above.

5. **Future relationship**     The Parties shall cooperate in good faith so that any announcement made in connection with the Combination aligns with the terms of this agreement and the intention of the Parties to partner in the operation of Flutter's US businesses under a dual brand strategy following completion of the Combination.

The Parties acknowledge and agree that they shall in good faith negotiate, together with other relevant stakeholders, in respect of: (a) the future ownership and conduct of Flutter's US businesses, and additional rights to be granted to FOX in respect of FDG following exercise of the FDG Option, in each case so as to provide optimum alignment between the two brands in the US, maximize the financial performance of each of TSG and FDG and establish the most efficient operating platform for the US businesses following completion of the Combination, (b) the structure of, and if necessary alternatives to, the Nil-Price Option, to permit FOX to realize the benefits of the FDG Option if it is unwilling or unable to obtain all requisite licenses or other regulatory approvals prior to the closing of the Fastball Put/Call and (c) alternatives to provide, if so requested by Flutter/TSE, liquidity to Flutter/TSE, in the event that FOX is unwilling or unable to exercise the FDG Option prior to the closing of the Fastball Put/Call. This period of negotiation shall commence with the publication of the announcement of the Combination and end with the publication of the shareholder documentation in connection with the shareholder meetings at which approval of the Combination will be sought from Flutter's and Stars' shareholders or the date that is six (6) months following publication of the announcement of the Combination, whichever is later.

6. **Confidentiality**     The terms of this document, including the agreements set forth herein, and any negotiations leading to it shall be kept confidential by the Parties, except (i) that the terms of this document may be shared with the other shareholders in FDG on a needs-to-know basis, provided that such shareholders are advised as to the confidentiality of such information and they agree to keep such information in strict confidence; (ii) as agreed in writing by the Parties or disclosed in a press release that was mutually agreed by the Parties prior to its release, (iii) to the extent that the terms of this document are publicly disclosed by another Party (unless such disclosure was in violation of the initially disclosing Party's obligations to any of the other Parties hereto) or (iv) as required by law or regulation. This confidentiality provision shall survive any termination of this document.

7. **Termination**     This document and the agreements set forth herein shall continue in full force and effect unless and until superseded by an agreement in writing between the Parties or until any public announcement by Flutter and Stars that the Combination will not or cannot be consummated.

8. **Legal effect**     The Parties agree that this document contains all the material terms of the Flutter Option and the FDG Option, and they intend that this

CONFIDENTIAL     FLUTTER_00086182

document shall have legally binding effect upon execution. In addition to any other right or remedy a Party may be entitled to under this agreement, a Party shall be entitled to enforce this agreement by decree of specific performance, injunctive relief or other equitable remedy.

**9. Governing law and jurisdiction**

The agreements set forth in this document and all disputes, claims, actions, suits or other proceedings arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York applicable to contracts wholly made and to be performed within the State of New York.

The Parties agree that any dispute arising from this agreement shall be settled by binding arbitration administered by JAMS in accordance with its Comprehensive Arbitration Rules & Procedures (the *JAMS Rules*) in effect at the time the arbitration is filed, and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. The place of arbitration shall be New York, New York and the arbitration shall be conducted in English.

[*signature page follows*]

CONFIDENTIAL                                   FLUTTER_00086183

Signed for and on behalf of:

Flutter Entertainment plc_____

Name/title:                    GARY McGANN, CHAIR

FSG Services LLC_____

Name/title:


TSG Interactive US Services Limited_____

Name/title:


6|6

CONFIDENTIAL

FLUTTER_00086184

Signed for and on behalf of:

Flutter Entertainment plc

Name/title:

FSG Services LLC

Name/title:     Mark Silverman/President

TSG Interactive US Services Limited

Name/title: Milon Goldstein
           EVP, CLO

1.ONS4034621/3  161381-0008

616

CONFIDENTIAL

FLUTTER_00086185

JAMS NEW YORK Reference No. 1425034540
------------------------------------------------------------X
In the Matter of the Arbitration Between

FSG Services LLC,

    Claimant and Counterclaim Respondent,

      and                          PARTIAL FINAL AWARD
                                         November 4, 2022

Flutter Entertainment plc,

    Respondent and Counterclaimant.
------------------------------------------------------------X

EXHIBIT 2

JUDICIAL ARBITRATION AND MEDIATION SERVICES

| | |
|---|---|
| **FSG Services LLC,**<br><br>    Claimant and Counterclaim-<br>    Respondent,<br><br>v.<br><br>**Flutter Entertainment plc,**<br><br>    Respondent and Counterclaim-<br>    Claimant. | Reference No. 1425034540<br><br>Hon. Kathleen A. Roberts (Ret.), Arbitrator |

## STIPULATION AND [PROPOSED] ORDER

WHEREAS, FSG Services LLC ("**FOX**") brought claims in this arbitration seeking to enjoin a series of transactions culminating in an initial public offering of FanDuel Group plc, as described in the draft Registration Statement on Form F-1 submitted by Flutter Entertainment plc ("**Flutter**") to the Securities and Exchange Commission (the "**IPO Transaction**"), and requesting a declaratory judgment that the IPO Transaction cannot proceed and would violate FOX's rights under the Legally Binding Term Sheet and Flutter's duty of good faith and fair dealing implied under the Legally Binding Term Sheet (the "**IPO Claims**") in, *inter alia*, FOX's Statement of Claim Supplement filed May 28, 2021 at ¶¶1-32 (Claim V) and Prayer for Relief, and FOX's Amendment to Statement of Claim Supplements filed March 16, 2022 at ¶¶3-20 (Claims IV.A and V.A) and Prayer for Relief ¶¶(a) and (b);

WHEREAS, Flutter denied all of FOX's claims and opposed FOX's entitlement to an order enjoining the IPO Transaction or providing any declaratory relief regarding the IPO Transaction, contending that FOX did not negotiate for or otherwise have any right to liquidity or

1

other rights regarding the IPO Transaction under the Legally Binding Term Sheet, *see*, *inter alia*, Flutter's Response to FOX's Statement of Claim Supplement filed June 25, 2021 at pp. 1-7, ¶¶1-20, pp. 8-15, ¶¶1-32, and p. 15, ¶¶1-3;

WHEREAS Flutter further contends that FOX's claims relating to the IPO Transaction are moot in light of the fact that Flutter is not proceeding with the IPO Transaction at this time and has agreed to provide FOX with a right to *pro rata* participation in the IPO Tranaction, if and when it proceeds as previously proposed, which Flutter maintains would address the concerns previously asserted by FOX, and all of which FOX denies;

WHEREAS, Flutter has represented that it is not proceeding with an initial public offering on the terms described in the draft Regisration Statement on Form F-1 submitted to the Securities and Exchange Commission, and has submitted a proposed Supplemental Claim relating to the parties' respective rights and obligations in a potential initial public offering relating to FanDuel;

WHEREAS, FOX and Flutter (the "**Parties**") tried the IPO Claims and all other claims, counterclaims, and defenses asserted in this arbitration in June-September 2022;

WHEREAS, the Tribunal shared its preliminary views concerning the IPO Claims with the Parties on July 12, 2022, as follows:

> With respect to the IPO, I think there is really pretty — again, as structured, the IPO that is presented in the F-1 is really inconsistent with both the letter and the spirit of the Legally Binding Term Sheet; particularly, no amendment or waiver of rights regarding the units that Flutter had basically committed to hold for the transfer to FSG. In my view, it was everybody's expectation that Flutter would not do something that would really compromise FSG's position; that is to say, the position that it would be in if it were to have exercised the option, so I really don't find persuasive the suggestion that the IPO somehow maintains the status quo. It's pretty clear to me that it was designed to single out FOX for reasons pertaining, I think, or actually leverage, under the circumstances, but that's really, I think, a situational development. [Tr. 4255:19-4256:16]

2

WHEREAS, the Tribunal also stated at the July 12, 2022 hearing that it was "certainly open to being further educated" [Tr at 4252:18];

WHEREAS, following subsequent discussions with counsel for the parties and additional briefing, and following Flutter's representations that it would provide FOX with a *pro rata* right to liquidity in any ListCo IPO Transaction (a representation the accuracy of which FOX disputes) and following Flutter's representation that it was not proceeding with the ListCo IPO as previously contemplated, the Tribunal remarked:

> [I]t seems to me that fundamentally what [FOX] negotiated was a holding position where they wouldn't lose anything by deferring other than the fact that they have to pay the carrying costs. And as I understand the current structure, they potentially could lose something by virtue of exercising their deferral right. That's what troubles me. [9/29/22 Tr. at 176:21-177:3]
>
> ***
>
> The pro rata participation right is not in the current IPO, which is the only thing that is before me, you know, at the moment, and is what my preliminary ruling addressed as far as my view as to whether it was consistent with the Legally Binding Term Sheet. [*Id.* at 177:12-18]
>
> ***
>
> My understanding is that the— the primary concern expressed by FOX has to do with their inability to participate in the opportunity presented by an IPO. I don't recall — and it's been a long time, many months here — whether there are other rights or aspects of what Flutter can or cannot do that they're complaining about because I don't off the top of my head recall whether things have been proposed that you want to do that they are saying violate, you know, fundamental business change or waive or amend. I mean, I really need to hear from FOX about that. [*Id.* at 181:14-182:2]
>
> ***
>
> I'm not going to write an award that broadly interprets their rights, you know, under this agreement where no dispute has been presented to me. That doesn't make any — I just wouldn't — I don't think that's my responsibility or really something that I'm being asked to do. The only objection that has been raised to the IPO — and I can go back and look at the pleadings — that I have been responding to in terms of expressing my concerns and my views has to do with the expressed concern that they are deprived of the opportunity to exploit the — participate in and exploit the IPO. [*Id.* at 183:7-21]
>
> ***
>
> And the burden is certainly to the extent they are alleging breach, they have to identify what the breach is. And the only breach I've heard so far relates to this very specific issue

3

of the IPO. I'm not going to rule on, you know, potential breaches in the abstract. It's the only ones before me. [*Id.* at 186:6-186:12]

WHEREFORE, the Parties hereby stipulate and agree as follows, subject to and conditioned on the Tribunal's entering an Order approving, directing and requiring all of the following:

1.      Flutter is not proceeding with an initial public offering on the terms described in the draft Registration Statement on Form F-1 submitted to the Securities and Exchange Commission. Flutter will not proceed with an initial public offering of FanDuel Group plc, FanDuel Group Parent LLC, any direct or indirect parent entity of FanDuel Group Parent LLC, or any other initial public offering involving, directly or indirectly, interests in, or assets of, FanDuel Group Parent LLC ("**FanDuel IPO**") pending (a) mutual agreement of the Parties as to acceptable terms for a FanDuel IPO, or (b) a determination by this Tribunal, following at least sixty (60) days' written notice to FOX, that Flutter's proposed terms for a FanDuel IPO do not violate the Parties' Legally Binding Term Sheet or Flutter's duty of good faith and fair dealing implied under the Legally Binding Term Sheet. In light of the foregoing, the portions of FOX's Statements of Claim pertaining to the terms of the previously contemplated IPO Transaction, including Claim IV.A and Claim V.A, are moot and do not require adjudication or entry of an award by the Tribunal.

2.      This Stipulation and Order does not alter the need for a prompt resolution of, and issuance of a Partial Final Award by the Tribunal resolving, all other claims that have been tried in this arbitration. This Stipulation and Order shall be deemed incorporated in such Partial Final Award. Nothing in this Stipulation and Order shall affect the confirmability or enforceability of any award entered by this Tribunal or the enforceability of any judgment entered on any such award.

ᘔ

3.      The Parties shall meet and confer on a schedule to address any disputes concerning

the parties' respective rights and obligations with respect to any FanDuel IPO proposed by Flutter;

provided, however, that if no agreement can be reached, the Parties shall submit their respective

proposed schedules to the Tribunal after meeting and conferring.

Dated:  October 24, 2022

By:___ /s/ Vineet Bhatia_____
Vineet Bhatia
Stephen Morrissey
Susman Godfrey LLP
1000 Louisiana Street
Houston, TX 77002
(713) 653-7855

Amanda Bonn
Susman Godfrey LLP
1900 Avenue of the Stars
Los Angeles, CA 90067
(310) 789-3131

*Counsel for Flutter Entertainment plc*

By:___ /s/ Gregory P. Joseph_
Gregory P. Joseph
Mara Leventhal
Christopher J. Stanley
Joseph Hage Aaronson LLC
485 Lexington Avenue
30th Floor
New York, NY 10017
(212) 407-1210

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Brian J. Fischer
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Ian Heath Gershengorn
Jenner & Block LLP
1099 New York Avenue, NW
Washington, DC 20001
(202) 639-6000

*Counsel for Claimant FSG Services LLC*

SO ORDERED:

Kathleen a Roberts
_____

5

Hon. Kathleen A. Roberts (Ret.), Arbitrator

Date:  10/26/22

JAMS NEW YORK Reference No. 1425034540

-----------------------------------------------------------------X

In the Matter of the Arbitration Between

FSG Services LLC,

    Claimant and Counterclaim Respondent,

       and                         PARTIAL FINAL AWARD
                                             November 4, 2022

Flutter Entertainment plc,

    Respondent and Counterclaimant.

-----------------------------------------------------------------X

EXHIBIT 3

## JUDICIAL ARBITRATION AND MEDIATION SERVICES

**FSG Services LLC,**

     Claimant and Counterclaim-
     Respondent,

v.

**Flutter Entertainment plc,**

     Respondent and Counterclaim-
     Claimant.

Reference No. 1425034540

Hon. Kathleen A. Roberts (Ret.), Arbitrator

## STIPULATION AND [PROPOSED] ORDER

Claimant FSG Services LLC and Respondent Flutter Entertainment plc hereby stipulate and agree, subject to the Arbitrator's approval, to appoint the Honorable Kathleen A. Roberts (Ret.) as Arbitrator for all disputes arising under the Flutter/FOX Legally Binding Term Sheet dated October 1, 2019, including the above-captioned proceeding and any other disputes that may hereafter arise. Nothing in this stipulation and order shall affect the confirmability or enforceabilty of any award entered by this Tribunal.

1

Dated: October 25, 2022

By:___*/s/ Vineet Bhatia*_____
Vineet Bhatia
Stephen Morrissey
Susman Godfrey LLP
1000 Louisiana Street
Houston, TX 77002
(713) 653-7855

Amanda Bonn
Susman Godfrey LLP
1900 Avenue of the Stars
Los Angeles, CA 90067
(310) 789-3131

*Counsel for Flutter Entertainment plc*

By: ___*/s/ Gregory P. Joseph*_
Gregory P. Joseph
Mara Leventhal
Christopher J. Stanley
Joseph Hage Aaronson LLC
485 Lexington Avenue
30th Floor
New York, NY 10017
(212) 407-1210

Terri L. Mascherin
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312) 222-9350

Brian J. Fischer
Jenner & Block LLP
919 Third Avenue
New York, NY 10022
(212) 891-1600

Ian Heath Gershengorn
Jenner & Block LLP
1099 New York Avenue, NW
Washington, DC 20001
(202) 639-6000

*Counsel for Claimant FSG Services LLC*

*APPROVED AND*
SO ORDERED:

Kathleen A Roberts
_____
Hon. Kathleen A. Roberts (Ret.), Arbitrator

Date:  10/26/22

## PROOF OF SERVICE BY E-Mail

Re: FSG Services LLC vs. Flutter Entertainment PLC
Reference No. 1425034540

I, Cathleya Fajardo, not a party to the within action, hereby declare that on  November 4, 2022, I

served the attached Partial Final Award on the parties in the within action by electronic mail at New York, NEW

YORK, addressed as follows:

Ian Gershengorn Esq.
Brian J. Fischer Esq.
Michael W. Ross Esq.
Jenner & Block, LLP
919 Third Ave.
37th Fl.
New York, NY   10022
Phone: 212-891-1600
igershengorn@jenner.com
bfischer@jenner.com
mross@jenner.com
    Parties Represented:
    FSG Services LLC

Vineet Bhatia Esq.
Susman Godfrey LLP
1000 Louisiana St.
Suite 5100
Houston, TX   77002-5096
Phone: 713-651-9366
vbhatia@susmangodfrey.com
    Parties Represented:
    Flutter Entertainment plc

Amanda Bonn 270891
Susman Godfrey LLP
1900 Avenue of the Stars
Suite 1400
Los Angeles, CA   90067-6029
Phone: 310-789-3100
abonn@susmangodfrey.com
    Parties Represented:
    Flutter Entertainment plc

Stephen E. Morrissey Esq.
Floyd G. Short Esq.
Susman Godfrey LLP
1201 Third Ave.
Suite 3800
Seattle, WA   98101
Phone: 206-516-3880
smorrissey@susmangodfrey.com
fshort@susmangodfrey.com
    Parties Represented:
    Flutter Entertainment plc

Terri L. Mascherin Esq.
Jenner & Block, LLP
353 N. Clark St.
Chicago, IL   60654
Phone: 312-222-9350
tmascherin@jenner.com
    Parties Represented:
    FSG Services LLC

Andrew Cherry Esq.
Jenner & Block, LLP
1099 New York Ave. NW
Suite 900
Washington, DC   20001-4412
Phone: 202-639-6000
acherry@jenner.com
    Parties Represented:

                                        FSG Services LLC

Gregory P. Joseph Esq.                  Emily A. Parsons
Mara Leventhal Esq.                     Sussman Godfrey LLP
Christopher J. Stanley Esq.             1201 Third Ave
Joseph Hage Aaronson LLC                Suite 3800
485 Lexington Ave.                      Seattle, WA   98101
30th Floor                              Phone: (206) 516-3880
New York, NY   10017                    eparsons@susmangodfrey.com
Phone: 212-407-1200                         Parties Represented:
gjoseph@jhany.com                           Flutter Entertainment plc
mleventhal@jhany.com
cstanley@jhany.com
    Parties Represented:
    FSG Services LLC


Jennifer Dayrit                         Brandon D. Fox Esq.
Mr. Mark Musico                         Jenner & Block, LLP
Susman Godfrey LLP                      515 S. Flower St.
1301 Avenue of the Americas             Suite 3300
32nd Floor                              Los Angeles, CA   90071
New York, NY   10019                    Phone: 213-239-5100
Phone: 212-336-8330                     BFox@jenner.com
jdayrit@susmangodfrey.com                   Parties Represented:
MMusico@susmangodfrey.com                   FSG Services LLC
    Parties Represented:
    Flutter Entertainment plc



        I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW

YORK on  November 4, 2022.


*/s/ Cathleya Fajardo*

_____
Cathleya Fajardo
JAMS
CFajardo@jamsadr.com